United States Court of Appeals for the Fourth Circuit. Oyez, oyez, oyez. All person having any manner or form of business before the Honorable, the United States Court of Appeals for the Fourth Circuit are admonished to draw nigh and give their attention, for the Court is now sitting. God save the United States and this Honorable Court. Be seated, please. We're going to, on the fourth case, we're going to go ahead and grant the motion. All right, the first case we're going to hear this morning is Waag v. Sotera Defense Solutions and Mr. Cabana, when you're ready, we'll hear from you. Good morning, Your Honors. I'm Andrew Cabana on behalf of the plaintiff, Mr. Gary Waag. This case here is a FMLA failure to, basically, interference failure to restore case arising out of Mr. Waag's. In October of 2012, Mr. Waag was the project manager for Sotera Defense on their NextGen contract. He suffered a traumatic injury in October, falling off a ladder, almost severing his hand, and went out on disability leave, short-term disability. And subsequent to that, when he, during that time period when he was out, the company gave his position to another employee, Mr. Devin Edwards. And subsequently, when he returned, they put him into a, basically, what we contend is a make-work or a sham position as an electronic warfare program, doing modeling and simulation, where the company had no, basically, no contracts, no past performance, et cetera. He was in that position, he actually only performed the position for about two weeks, and they subsequently laid him off. And we contend that they then, by doing this, they engaged in both FMLA interference, and as we amended down below, we sought to amend an FMLA discrimination case to this matter. The district court issued summary judgment, and we contend the main issue here is that summary judgment was improperly granted because of the sheer number of genuine disputes of material facts in this case that should have prevented summary judgment. The first material fact is that, that is in dispute, is that the duties and responsibilities of his old position as a project manager on a $7 billion next-gen contract were vastly different from the new duties and responsibilities as a, basically, doing business development, and this is established in the record by both Mr. Wagg's testimony and the testimony of his former boss. I'm sorry, counsel, I don't mean to interrupt you, but can I just ask a question? I thought you had an argument that would sort of be logically before that one, that whether or not the position was equivalent, your client was nevertheless entitled to his original job, unless that original job had somehow gone away. Is that not your first argument? Well, it is our, well, my first argument is just there's so many material and factual disputes that there should never have been summary judgment. That would be as a matter of law, right? As a matter of law. Did it also have a legal argument? Right. Yes, I do contend, we do contend that his original position was still in existence, and they failed to restore him to that position, and unlike in the cases cited by defense counsel where the original position was eliminated or there had been a reorganization Doesn't you have to go to the statute first? In other words, the statute puts it in the disjunctive, doesn't it? The statute says or. It says, right, you can restore to the original position or an equivalent position. Our contention is they did not restore him to his original position, nor did they restore him to an equivalent position. They restored him to a make-work position, which was scheduled to be eliminated, and the regulations under the statute says if the new position is scheduled to be eliminated in a RIF, it is not, you know, if it's scheduled for layoff, it is not an equivalent position. Defense counsel actually in his opposition and in their supplemental documents now have produced a document contending that on January 18th of 2013, Mr. Waugh was on some kind of RIF list. This is literally the first time this has been contended. Well, if that's the case, he's restored to a job on January 1st that is scheduled for a RIF that's first listed for a RIF on January 18th. That would create a material factual dispute that this was a sham position. There was no reason. They had no intention of maintaining this position for Mr. Waugh. They just had to put him somewhere because they know he had been out on protected leave. Other material factual disputes are created by the e-mail from Kathleen LeSueur, the vice president of the company. After she learns that he's on short-term disability and will return in mid-December or January, she says, I need a new PM for SS NextGen. I don't even get it. What's the issue there? Well, the issue is the job. It's got stuff coming up, and she wants someone to be able to go to the meetings. Why is that a problem? Right. So she needs to fill the job, but the decision by them to fill the job permanently rather than they. The e-mail doesn't say that. It doesn't say I need to fill this job permanently and fire the other guy. But they do fill the job permanently. They set a pattern. Why is the e-mail helpful to you? I just don't understand how that e-mail raises a factual issue. I think it creates a factual issue because at that point she's making the decision we need to fill this position, and I think a jury could reasonably believe she's making the decision we need to reasonably fill this position permanently. And not give your client an equivalent job. Do you think you can read that into the e-mail? Well, that's just. A reasonable juror could look at that e-mail and say that shows that she did not plan to give your client an equivalent job. Well, that e-mail plus her later actions. On December 20th, she removes him from the core management group. On December 26th, they tell him he thought he was, that Mr. Evans was just working in the job temporarily, and he finds out that it's going to be a permanent move. So many factual disputes. The factual dispute that they say they have to keep Mr. the new person in the job because of stability, yet they also say that the job has now, well, they now in the latest iteration say the job was actually eliminated. But down below they said, well, the job had turned into a part-time job. And so you need stability. And then they're saying, but there was nothing to do in the job, so we couldn't put him back in the job. You really want to be fair with the record. The problem was that the contract qualified the company for submitting requests, submitting bids, but there were no bids requested at that point in time. And Mr. Edwards came in and was able to just take care of the preparation for when a bid would come in, a request for a bid would come in. He would be ready, but he said it took him 20%, and so it was only part-time. That would have faced the same problem would have faced your client when he came back. So I just don't think you ought to make something more than what it is. Treat the record fairly. I'm not trying to make anything more than it is. But one thing, too, they contend in there down below that there was absolutely no contracts for the company to respond to during all of 2013. We've presented evidence that there was $86 million in contracts awarded to other vendors. They've now said in their opposition for the first time ever, well, those contracts were somehow reserved for other, for bigger vendors. They've provided no record evidence for this contention in their opposition that somehow Sotera was permitted to bid on these $86 million in contracts. The only contention for that is in the opposition. They now say, well, we weren't permitted to bid on this, providing no record evidence to support this contention, which, again, creates a factual dispute. I think just the ---- Why does that create a dispute? Well, it creates a dispute. They're saying there's nothing to do, and yet ---- They say there was nothing to do and that they didn't get a bid until the following year. They didn't succeed on the first one. They succeeded on the second one. But for a whole year, they had nothing, no requests for bid under that contract, that they could respond to. And we would contend that a jury could believe that that's not true, that there's a document in the record from February of 2013 showing all the contracts that are coming up for bid under the next-gen contract. It was in a planning meeting. This is shortly after his termination, and it shows a list of eight next-gen contracts that are coming up for bid. So this contention that there's no work on the contract, we contend is ---- When was a request issued on those eight? We do not know that. They say that ---- The fact that they're going to put these contracts out, they weren't funded, and they could not spend the money. The whole overall contract, you keep calling it a $7 billion contract, that means they were authorized to spend that. But then their authorization under the budgetary restrictions precluded them from issuing the actual request for bid. Right. And it seems to me, come to grips with the fair part of the thing. You know, your city is not unsympathetic, but I must say it's problematic when you exaggerate or twist the facts. I'm not trying to exaggerate, Your Honor. But the fact is the job he had as a project manager, he had identified 47 tasks associated with that. In his testimony ---- A lot of those tasks were post after you win a bid and develop the bid. You have to put people on it. The idea is he was basically a project manager, which is to develop and present bids for new business under the contract. And he was not guaranteed any of those contracts. He was competing with 12 or 11 other qualified contractors in order to get those. And the district court said that that function, that skill of soliciting those bids and projecting those bids was the same as the job which he was brought in to do in the new position, which was the job development, developing bids and trying to get contracts, or substantially equivalent. And we would say it's not in that as a project manager, he knows there are going to be task orders issued to his company. And it's like he has a hunting or fishing license to go out in a game park. The government issues requests for bids on other contracts where they don't prequalify. In other words, in this particular contract, they prequalified 12 contractors. But none of them is guaranteed a contract. You have to go get it. You have to bid on it. You have to develop it. You have to lay the foundation for it. Right, but in his new position, he's not even guaranteed that the government will listen to him. And the fact is he's only in his new position for about two weeks before they riff him, which leads us to believe that a jury could reasonably believe that was a sham position, which is our contention, that they had no intention of keeping him in that position. I think further evidence of that is the fact that Mr. Gerrard, his boss in this new position, stays on for several months, but they let him go right away. And they only let Mr. Gerrard go once they realize that they're not going to get any contracts in this new electronic warfare program. But Mr. Wagg, they let go immediately, even though they don't know one way or the other. The life cycle of a government contract is usually multi-year. It's a year-out bid. You're looking for a bid that's going to come out in, let's say, next June or next August. And then you start preparing for it and lining up subcontractors, et cetera, and getting yourself in position to bid. To expect him in two weeks to be able to generate business in a 100% pure business development position is a fallacy. And so our only contention is the jury could reasonably believe that this was a sham position, you know, slated for elimination. And if that's the case, it then violates the regulations under. How long is it slated for elimination according to the record? According to the record, well, there is no he's eliminated on February 14th. But now they are contending that Mr. Wagg is on a RIF list on January 18th, which is about two weeks after he returns to work. In their opposition, they attached new documents, which they claim he's now on a RIF list. What's interesting is that RIF list and the RIF list produced by Ms. Felix during discovery do not agree. And the fact is neither of these RIF lists were ever seen by Mr. Haig, who actually made the decisions. He says there was no RIF list presented to him when he RIFed Mr. Wagg. So they're creating a list, and we say all these factual disputes, you know, we have an e-mail from Lisa Bloom saying, well, what about she's concerned. She's the vice president, and she's concerned because what about, you know, Gary's not being returned to his equivalent position, his original position. And so she's concerned. You know, this idea that they have to create stability in a contract that has no work. It can be one or the other. If the contract is very busy, that would make sense. The fact that they never issue him any FMLA documents and that they then never designate him as a key person, but basically are treating him like he's a key employee and needs to be replaced immediately. That creates, I think, a factual dispute. You know, the absence of them, they've never been able to produce any criteria for why the RIFs were done and why he was first on the list. We create, we believe that creates a factual dispute. Their failure to consult with their HR manager, Mr. Smith, who he contended he was never consulted, and that was the normal practice was for him to be consulted. He's never consulted on this RIF. How many people were laid off? In the first RIF, there's a, I think, like. It was a rolling RIF. How many people were laid off? I don't know the exact number. I know in the first one it's about 10, I think, 8 to 10 people. Not more than that. Well, and we would contend that. See, they contend because there's a risk. Answer my question. How many people were laid off because of the economic conditions? I don't know that number. I do believe, I know they've testified that now only 50 people remain from the 250 that were at Sotera, but I don't know if that's all because of the economic conditions or if those people have gone and found better positions or what has happened. But we would also contend if he was going to be laid off, if there was going to be a reorganization, and let's say in November. So they've reduced from 250 employees to 50? That is what they contend, yes. And I see my time's expiring. Do you dispute that? I don't dispute that, but I say it's irrelevant because it only goes to damages. If he was going to be caught up in a later RIF based on true criteria, that would go to his damages. But the RIF in February, the fact that he's at the top of the list is solely because of he went out on ethanol A. I thank you for your time. Can I ask one very quick question? I'm sorry, just to clarify for me. So your brief does have this statutory argument that you are, a leave employee is entitled to be restored to his prior job if that job still exists. I'm not urging you to argue it because I think it is very hard to square with the statutory language. I'm just trying to get from you, are you still making that argument or is that not something we need to address? No, we are still making that argument, but we're also contending that the factual disputes, we don't even need to reach that. Thank you, Your Honor. All right, Mr. Stone. Good morning, Your Honors. Devin Stone on behalf of Saterra Defense Solutions, and may it please the Court. I'd like to start with, I think, some common ground between the two cases in this case. The record is truly uncontested in this particular case. Below, there was a list of undisputed facts in support of the motion for summary judgment, and Mr. Wagg really did not dispute any of those facts. He may now contend that the legal significance that stems from those facts are different, but the underlying facts in this case are undisputed. It's easy to forget that in late 2012 and early 2013, that Congress was in turmoil because they were unable to pass a budget, and as a result, it sent shockwaves through the entire defense industry, which relies heavily on government contracts. It wasn't just the defense industry. That's very true, Your Honor. Some people, of course, were happy that no budget was passed, but the defense industry in particular was very unhappy that there was no budget. You're lucky you have three judges here. And as a result, the defense industry, and Satara Defense Solutions in particular, was scrambling to cut overhead to make sure that they survived what was a perilous situation. They had no idea how long there would be no budget. They had no idea when they were ever going to have additional contracts to fulfill, and it was in that circumstance that Mr. Wag unfortunately returned to his employment with Satara. He had, for better or worse, essentially like Rip Van Winkle, slept through the run-up to sequestration in October of 2012, and when he returned, the landscape was completely different. And in that circumstance, the great next-gen contract that was such a theoretical boon to the company simply dried up. And as we've talked about before, if the next-gen program is like a hunting license, in this case, it's like a hunting license for a forest with no game in it. What is your response to Mr. Cabana's suggestion that there were eight requests for bid under the contract? There are a few problems with this, Your Honor. The first is that the entire basis for Mr. Wag's contention that there were task orders available come from unauthenticated web printouts that are pure hearsay. But even if the documents on which they rely were admissible, the point is that Satara had no contracts. They were not able to bid on anything. They were not in a— My question is, were they requested to bid on eight contracts that he referred to? Absolutely not. And what's the record show? The record shows that Mr. Wag's supervisor, Dan Haig, and his supervisor, Kathleen Lasseau— well, I'm sorry, only Lasseau and Devin Edwards, the fill-in for the program manager position, attended the government kickoff meeting in November of 2012, where the government said that all of the proposed task orders are going to be put on hold. And there is absolutely no evidence whatsoever— When you say task orders, those were not requests for bid? They were task orders that were anticipated? Your Honor, I'm using task orders and RFPs synonymously. In this particular program, the NextGen— I'd just like to have what the record shows about the eight requests for proposals that were identified by Mr. Cabana. If you could just answer that, what the record shows on those eight. There's really no record to speak of, Your Honor. The only evidence that they existed at all comes from a web printout, and there's no evidence from anyone from Satara that— Did Satara bid on those eight? No, they did not. And is there an explanation why they did or did not? There's no explanation except that if we look at the actual or supposed evidence that Mr. Wag proffered, if those were indeed provided in 2012 or 2013, and they're not backdated, it's entirely possible that they were awarded in 2014, but the award date is earlier. If they were in fact provided, the unauthenticated document that Mr. Wag provided simply says that they went to companies like Leidos, Booz Allen Hamilton, Northrop Grumman. There's no evidence that Satara was qualified to bid on them, that Satara had the capability to bid on them. There are—if you've ever seen a task order RFP, they're hundreds of pages long and can contain any kind of requirement such as capitalization or top secret clearance. There is nothing on the record whatsoever that Satara was in any position whatsoever to bid on any of these things, if indeed they were even available. What the record does show is that all of the evidence says that Satara was not aware of any task orders that they could bid on. Of course, Satara wouldn't have any personal knowledge of what other companies were doing, and to suggest that Satara was somehow hiding the ball because they were not aware of these unauthenticated potential RFPs is, I think, a misinterpretation of what the record shows. I wish I could provide more information, but the record shows essentially nothing about these supposed task orders, except that the only evidence that exists shows that Satara wasn't available and was not in a position to do so. Satara became what's called a prime contractor in October of 2012. So the idea that there were somehow these latent task orders before the government kickoff meeting in November, I think, misses the point. And in the first oral discussion, Your Honor referred to it as a prequalification. It's like being prequalified for a loan. Just because you're prequalified for a loan when you're looking for a house doesn't mean you're going to win that house. There are hundreds, if not thousands, of things that must occur in the interim, and what the record shows is that the key issue is that Satara did not win any task orders, and did not win any task orders until mid-2014. So for Mr. Wagg's argument to hold water, he would essentially require Satara to hold his position open with nothing to do for a year and a half. And we would submit that the FMLA does not put that obligation on any employer to hold them in a job that essentially doesn't exist for years, simply because they happen to have taken leave at a certain time. Well, his argument is that the job did exist, but that Mr. Edwards occupied it. Your Honor, it seems to me that if a job starts out as full-time, but then becomes a part-time position that is so small that it is a shell of its former self, a one-tenth position, that in fairness, that should not be considered the same job. And in fact, if Satara had restored Mr. Wagg to that position at a one-tenth time part-time position, I think we'd be right here in front of you and Mr. Wagg would be arguing that he was not given his full restoration rights because he was restored to a part-time position. So, under those circumstances, it's our position that, in fairness, that original position, the program manager, the full-time program manager position for the NextGen program, really didn't exist in the same form. And as a result, this Court's jurisprudence in Yashchenko and the Sixman case, I think, are persuasive, if not controlling, that when the original position no longer exists or, in this case, is just a shell of its former self, an employee is actually entitled to no restoration rights. Was that argument made in front of the district court? I thought the district court understood that everyone agreed there had to be restoration, but now the argument was about whether this position was equivalent. Yes, Your Honor. In fact, the district court's decision does have a passing reference to saying that everyone agrees. However, in our reply brief in support of the motion for summary judgment and an oral argument, I think the first argument we made was that it's a question as to whether restoration rights exist at all. However, that being said, the main argument has always been that Mr. Wagg was restored to an equivalent position. And in our brief, we provide a chart that lays out every facet that you could possibly think of and compares the prior or the program manager position to the position that Mr. Wagg was given upon his return. And I think it's important to note that it's sort of two arguments that Mr. Wagg is making that are sort of mutually exclusive. The first is that the position he was given upon his return was not equivalent. He's pivoted in the appeal to focus mainly on this idea that the new position was a sham. But if you really compare the two jobs as they existed and not in a vacuum, as Mr. Wagg would, you can see that not only are the positions equivalent, but he was in a much better position upon his return than when he left. Because as we've already discussed, if Mr. Wagg was returned to this one-tenth part-time position, he would be even more likely to have been laid off upon his return given the massive layoffs and sequestration. However, Satara went above and beyond to try to find a place for Mr. Wagg. And to do so, they put him in charge of this EWPMT contract proposal. And this electronic warfare trainer software is actually just like a task order that the task orders that were not forthcoming in the NextGen program. So if the NextGen program is like a hunting license in a forest with no game, the contract that they were specifically going after in the electronic warfare department was not only like a hunting license, and it was not only in a forest that had game to hunt, but it was like having a 10-point buck in your sights. They had this contract in their sights, they were going after it, and if they had been successful, they would have snagged a $70 to $80 million program slash deer. I mean, it was a good situation to be in. As opposed to what he's arguing for now, which is that he should have been returned to that part-time position. And the fact that Mr. Edwards was temporarily assigned to the program manager position shouldn't really have any bearing on this whatsoever. Mr. Edwards was working 90 to 80 percent on other matters, and that's the reason that Mr. Edwards was able to retain his job. It's the reason he was paid slightly more than Mr. Wag was, even after Mr. Wag received a very large pay upgrade, a pay upgrade that he retained while working for the electronic warfare department. And it was easy for Mr. Edwards to fulfill this position, because he was essentially like the captain of a ship that's docked at port. There's not a lot to do when there aren't any task orders to go after. And the idea that the EWP position was a sham just has no bearing or has no support in the record at all. This was a relatively new department, but a department with support, with a very experienced vice president in charge of electronic warfare, Mr. Jim Gerard. And Mr. Wag had been saying to Satara, since he started with Satara, that his primary area of expertise was modeling and simulation. There's an email on the record from January 2011, before he comes on to Satara, where Mr. Wag says, if you guys are interested in starting a new modeling and simulation department, I know that's not your main focus. I would be very interested, and very interested is a quote, in being a part of that department. And lo and behold, Mr. Wag was given exactly what he wanted. And that's the reason that he was actually quite happy in January of 2013 that he was given this position, because it fit right in his wheelhouse, and he was given the same responsibilities. To go back to the equivalency issue for just one moment, the program manager position, before any task orders are won, is 100% business development. It is business development to meet with other vendors and contractors, and then to petition the government to provide business in the form of awarding task orders. In the same way, that is exactly what Mr. Wag was doing in his job as running the EWPMT proposal. He was meeting with contractors, trying to win this contract, which they've characterized as pure business development. If that position is pure business development, then the program manager position is also pure business development. But that's not to say that those roles were not going to change. The record shows that people were wearing many hats at many times, and that eventually the program manager position would have changed into running these task orders. In the same way that the EWPMT position would have changed into running the contract if they had been successful. The argument that this whole department was created as a smokescreen to allow Satara to fire Mr. Wag, I think is just beyond belief. The idea that they hired a new vice president, they hired other employees and put them on staff. The idea that they were trying to create a new line of business that fit in Mr. Wag's wheelhouse. And the fact that as a result of these rolling layoffs, Mr. Girard himself was laid off. That is quite the smokescreen, if that were the case. But obviously that is not the case. The undisputed facts show that Mr. Wag was given an equivalent position with the same pay, same responsibilities. This case is even clearer than the Sixman's case, where the person was transferred from a data management position that ran the IT for an entire company. But then was given a very discreet role with disaster recovery. He was essentially given a demotion that he claimed his responsibilities were less and he had less of a staff to manage. Here, none of that is the case. Mr. Wag was given the same responsibilities. He had the same jobs to do. He reported to a vice president. He didn't have any staff as the program manager. He didn't have any staff as running the EWPMT program. Very quickly, Mr. Wag has questioned Satara's response to an interrogatory, claiming that it says that the entire reason for the replacement was for stability. If you look at the interrogatory response, it says stability and the fact that there was no work and it was a part-time position. Satara's position has always been the same on that. And the fact that hundreds of people were laid off, essentially 20 a month for six months in 2013, shows that there's no pretense here. It is purely an economic decision, one that Satara took with a very heavy heart, and as a last case resort in the face of government sequestration. And they did the best they could. And it had nothing to do with the fact or the idea that Mr. Wag was discriminated against. He was simply the victim of circumstance. Thank you, Mr. Stone. Thank you, Your Honor. Mr. Fano. Mr. Stone has made much of that there was nothing before Satara regarding any of these other contracts. Yet Satara's own documents produced during this case, and specifically at page 940 and 941 of the appendix, SDS004658 and 4659, show that in January or February of 2013, right at the time when Mr. Wag was being let go, they had, and it shows here, SES, they have the GCCSA contract, responded to request RFI, I assume that's request for information, conducting customer call plan, and it says that they're qualified for all of these. There's 1, 2, 3, 4, 5, 6, 7, 8 contracts listed in their own documents they produced during discovery, which then Mr. Wag went online and said, what happened with these contracts, and found out that other people obtained these contracts. So this idea that they were unaware of them, or if maybe they chose not to bid, we'll never know, or at least we won't know unless this gets remanded for trial. But this idea that there was no work, then why is he responding to an RFI? And that's their document. And then you look at the second page, page A941 of the joint appendix, and it shows the electronic warfare integration program, 2014. It says that they're prequalified, have our kickoff, is unfunded, PM plans to pull money from other plaintiffs. Are you taking the position that their reduction in force was a sham? Not in totality. I'm taking the position that including Mr. Wag in the first phrase of the reduction in force was purely because if he never breaks his arm, tears his arm off and has to have it reattached, and never goes out on FMLA, he stays as program manager on the SOTERRA project, the SOTERRA next-gen project, and only maybe later, if there's some kind of reorganization, would he have been subject to these rolling layoffs. But that in the first layoff, it was a sham. He was put on that list solely because he had been out on FMLA. He's put into the electronic warfare project only because to give him some position to put him in because he's coming off of disability leave. And I think evidence of that is that they only let go of Mr. Gerard after they lose the bid on the EWP electronic warfare integration project. But they let go of Mr. Wag basically right after the bid is submitted. So they submit the bid, and then they let him go. And so the idea that they're building this team and that he's going to be part of it, he's put on that team as a temporary stopgap measure. There's no intention to keep him on that team because they let him go. They don't even know if they're going to win this bid. This is, as they even say, possibly an $85 million bid. They don't wait to see, did we win this bid, and if so, we're going to need Mr. Wag. They're like, well, we don't need him. We've got to get rid of him. This is just, you know, we put him here just as a stopgap. It's been six weeks. Now let's move him out. And so, yes, I would contend that placing him in that contract, and his own testimony has said he only worked in that contract about two weeks of the six weeks he was officially in that position. The rest of the time he was doing pricing on other people's contracts and doing other tasks was just a sham to try because they realized that they had to place him somewhere or else they could be in violation of the FMLA. But you're saying that if he had stayed in his old position, absent the leave, if he'd been in his old position. Our contention is, first and foremost, is that a jury could conclude because Devin Edwards stayed in that position for years, that he'd still be there. But was there any, did you dispute the fact that Mr. Edwards was only spending between 10 and 20 percent of his time on that project? We do dispute. I've seen no record evidence. I'm sorry, I don't, is there a. . . I've seen nothing in the record that establishes this. And he says today in his briefing that the job was essentially eliminated. And, again, there'd be an e-mail, there'd be something. We have, they turned over 8,000 pages. It's essentially eliminated. I'm just saying how did you put into dispute in the record that Mr. Edwards was not doing the job full time, that it was only 10 or 20 percent of his time? Where would I look for the thing that puts that fact at issue? Well, we've disputed that. Mr. Webb never heard that. He said in his testimony he was unaware of that. You're asking us to prove a negative, but. . . Right, and the factual dispute is they've never. . . If that was true, they should have somewhere in this record, the thousands of pages we've turned over, a e-mail, a something, a reorganization, something saying he's only working on this 10 percent, other than Mr. Stone has said this. Mr. Edwards, he had other jobs, didn't he? My understanding. . . He had a broader portfolio of work than just a job in that position. That's correct, and that's because Mr. . . . So that's not disputed. It's not disputed that he had other projects he was on. He was paid more, too. It is not disputed he was paid more. But just to conclude, Mr. . . . The only reason Mr. Wag did not have a broader portfolio is when they gave him the project manager position, they said you must surrender all your other tasks because this is so crucial. And then now they're saying that. . . Yeah, but you say that. . . Was that a sham, too? No, I don't say that's a sham. Okay, well, I mean. . . They said this is crucial. But, you know, these facts don't . . . They're important. We've got to know what the material facts are to discrimination. And apparently Edwards took over when your client was injured, but at that time he had a bunch of other jobs that your client didn't have. And the record as it stands, undisputed, is that it was only 10 to 20 percent of his time was committed to what Mr. Wag was doing. And I guess that's where I have not seen where they get the 10 and 20 percent, other than Mr. Stone saying it in multiple briefs. I don't see anybody testifying to that or giving an affidavit to that fact. And I . . . All right. Thank you, Your Honor. All right, we'll come down and recounsel and proceed on to the next case.
judges: Paul V. Niemeyer, William B. Traxler, Jr., Pamela A. Harris